## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **J.P. MORGAN SECURITIES LLC,**   ) | |
| ) | |
| **Plaintiff,**   ) | **CIVIL ACTION NO.** |
| ) | |
| **v.**   ) | |
| ) | |
| **DAVID M. ANDERSON,**   ) | |
| ) | |
| **Defendant.**   ) | |

## COMPLAINT
## <u>(INJUNCTIVE RELIEF SOUGHT)</u>

Plaintiff, J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this

Complaint and Application for Temporary Restraining Order and Injunctive Relief

against Defendant, David M. Anderson ("Anderson" or "Defendant"):

## <u>Preliminary Statement</u>

1.    This action is for a temporary restraining order and a preliminary

injunction to maintain the status quo pending resolution of an arbitration proceeding

between JPMorgan and Defendant that concurrently is being filed with FINRA

Dispute Resolution.[1]

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes. A true and correct copy of Rule 13804 is annexed to the accompanying Declaration of Leonard Weintraub.

2.     This dispute arises out of Defendant's resignation from JPMorgan on June 14, 2022, and the immediate commencement of his employment with Stifel, Nicolaus & Company ("Stifel"), a competitor of JPMorgan.  At the time of his resignation, Defendant worked as a Select Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Rochester, Michigan.

3.     JPMorgan has learned that since resigning from JPMorgan and joining Stifel, Defendant has solicited at least ten JPMorgan clients to move their accounts from JPMorgan to him at Stifel.  JPMorgan has learned that Defendant is contacting JPMorgan clients, including calls and text messages to clients on their personal cell phones, seeking to induce such clients to transfer their accounts from JPMorgan to him at Stifel.  The clients have informed JPMorgan that Defendant's communications have been more than simply announcing his change of employment, and that he is actively requesting meetings with the clients or otherwise seeking to induce them to do business with him at Stifel.

4.     Specifically, numerous clients have informed JPMorgan that Defendant called them after he resigned from JPMorgan seeking to discuss Stifel or set up a meeting to discuss transferring their accounts to him at Stifel.

5.     Some JPMorgan clients have indicated that in Defendant's solicitation calls, after Defendant informs the clients that he has left JPMorgan and is now with

Stifel, Defendant continues to tell the clients that it would be better for the client if they follow him and do business with him at Stifel and asks them to join him.

6.     JPMorgan clients also have reported that Defendant's "pitch" includes touting his new firm in a further effort to induce clients to transfer their business to him at Stifel.  Specifically, Defendant is telling JPMorgan clients, among other things, that the clients would have more products, and better investment options and services at Stifel than those at JPMorgan, that he was restricted at what he could offer the clients at JPMorgan and has much more flexibility at Stifel, and that Stifel is a better opportunity for the clients.  On information and belief, Defendant made these statements in a further effort to induce JPMorgan clients to transfer their accounts to him at Stifel.

7.     Not only is Defendant soliciting clients through phone calls and electronic communication such as text messages, but in one particularly egregious solicitation, a JPMorgan client (a couple) reported that Defendant showed up to the client's private residence unannounced on a weekend with Stifel marketing materials in hand pitching Stifel to the client.  The JPMorgan client indicated that Defendant attempted to explain what he could do for them at Stifel in an attempt to induce the client to move their relationship from JPMorgan to Defendant at Stifel even though the client was not interested.  The JPMorgan client indicated that Defendant's visit

to their family's residence was unplanned, unannounced and made them feel very uncomfortable.

8.      As noted above, at least ten JPMorgan clients have informed JPMorgan that Defendant has solicited the clients' business, asked the clients to meet with him at Stifel, pitched Stifel's capabilities and products and services that they did not ask about, or otherwise attempted to get the clients to transfer their accounts to him at Stifel.

9.      In addition, on information and belief, Defendant took with him to Stifel JPMorgan's confidential client information, including client contact information, such as cell phone numbers, which, on information and belief, are generally not publicly available, without which he would have been unable to immediately commence calling/texting and soliciting JPMorgan clients as soon as he resigned from JPMorgan.

10.     Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 15 JPMorgan households, with assets totaling approximately $24 million, already have transferred their accounts to Defendant at Stifel

11.     At the time he left JPMorgan, Defendant serviced approximately 311 JPMorgan clients/households with approximately $311 million in total assets under management, the substantial majority of which were either pre-existing JPMorgan

clients at the time they were assigned to Defendant, or were developed by Defendant at JPMorgan with JPMorgan's assistance.

12. Defendant's conduct constitutes a breach of his employment agreements (which contain non-solicitation and confidentiality provisions), JPMorgan's Code of Conduct (which he agreed to abide by), and a violation of his common-law obligations to JPMorgan.

13. To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from further using and compelling the return of JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against Defendant in a related arbitration that JPMorgan also is in the process of commencing.

## Jurisdiction And Venue

14. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Rochester, Michigan.

## The Parties

16.     JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York. The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.  Defendant maintains securities licenses through FINRA.

17.     JPMorgan provides traditional banking, investment, and trust and estates services in Michigan through its Chase Wealth Management branch offices. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

18.     Defendant is an individual who at all times relevant herein was employed and/or conducted business in Oakland County, Michigan and is and was a citizen of Michigan.  Defendant also is a registered representative currently

employed by Stifel in its Rochester, Michigan office.  Defendant was previously employed by JPMorgan in its Rochester, Michigan branch office.

19.     In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims and controversies arising between himself and JPMorgan.

## Factual Allegations

20.     Defendant commenced employment with JPMorgan or its predecessors in November 2009, when he joined Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan, and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "Non-Solicitation Agreement), which contains provisions prohibiting him from soliciting the firm's clients for a one year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.  Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

21.     For most of his employment, Defendant was a Private Client Advisor for Chase Wealth Management, working out of a JPMorgan Chase bank branch

office in Rochester, Michigan.  As a Private Client Advisor, JPMorgan Chase referred its bank clients to Defendant in order for him to build JPMorgan's relationship with such clients.  Defendant sat at his desk at the JPMorgan Chase bank branch and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.

22.    In or about April 2021, Defendant was promoted to a Select Advisor in JPMorgan's Select Advisor Group, still working out of JPMorgan Chase's bank branch office in Rochester, Michigan.  JPMorgan's Select Advisor Group is a prestigious and select group rewarding JPMorgan's most senior, high producing Private Client Advisors.  Select Advisors' primary focus is to grow and maintain their existing book of business developed from the referrals from JPMorgan, but they no longer receive new client referrals from JPMorgan Chase.  JPMorgan Advisors chosen for the Select Advisor Group are rewarded with access to additional JPMorgan services and an increased compensation payout.  Defendant remained a Select Advisor from April 2021 until his resignation on June 14, 2022.

23.    In consideration for entering into and continuing his employment relationship with JPMorgan and executing the Non-Solicitation Agreement, Defendant

was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

**Defendant's Employment Agreement And Obligations To JPMorgan**

24.     As noted above, Defendant entered into the Non-Solicitation Agreement with JPMorgan or its predecessors that contains provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

25.     Section 7(a) of the Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

26.     Section 7(b) of the Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i.     *names, addresses and telephone numbers of customers and prospective customers;*

*ii. account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

*iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*     \*     \*

*vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*     \*     \*

*viii. information concerning established business relationships;*

*ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

27.     In Section 7(c) of the Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

28.     In Sections 7(d) and 7(e) of the Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third

10

party, and to return all JPMorgan Confidential Information upon the termination of his employment.

29.    In Section 8 of the Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

   a. *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

   b. *You understand and agree that JPMC has developed and uses a unique business model for the sale of investment products. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with CISC and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from*

11

*the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC.*

c.  *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*  (Emphasis added.)

30.     Although Defendant has some limited prior industry experience before joining JPMorgan, on information and belief, he brought very few, if any, clients with him to JPMorgan.  In fact, Defendant was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan in the "Attachment A" to the Non-Solicitation Agreement, and those pre-existing relationships would be carved out from the non-solicitation restriction in the agreement.  The Attachment A to Defendant's Non-Solicitation Agreement is blank and he listed no such pre-existing relationships.

31.     In Section 10(a) of the Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with his counsel:

i.  *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement.  You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its*

12

*customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

32.    In addition, in Section 10(b) of the Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the agreement.

33.    Additionally, in Section 3(b) of the Non-Solicitation Agreement, Defendant agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

34.    Defendant had access to and is bound by JPMorgan's Code of Conduct, which is made available to all employees on the JPMorgan intranet, as it

was updated from time to time.  The Code of Conduct has similar confidentiality provisions to those in Defendant's agreement with JPMorgan.  As an Executive Director with JPMorgan, Defendant also was bound by JPMorgan's non-solicitation and confidentiality responsibilities set forth in JPMorgan's "Responsibilities of Former Employees Policy – Firmwide."

35.    Section 5.1 of JPMorgan's "Responsibilities of Former Employees" policy link further provides, in relevant part, that when you leave JPMorgan:

> *As a former employee, you are not permitted to use any Company assets including the use of JPMC memberships, access to information through JPMC vendor systems and client and employee information and distribution lists or access its systems.  You may only access its buildings in visitor status.  You must also turn over to the Company, in good condition, all assets of the Company that are in your possession or control (or come into your possession or control in the future), including but, not limited to:*

> *              \*        \*        \**

> - *all Confidential Information, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops, personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices belong to the Company and are used at locations other than a JPMorgan Chase place of business.*

> *You are not permitted to duplicate or remove from JPMorgan Chase's premises, or directly or indirectly access, use or disclose to anyone, any Confidential Information.*

36.     Section 5.3 of JPMorgan's "Responsibilities of Former Employees" policy sets forth additional responsibilities not to solicit clients, and provides, in relevant part:

> The Company considers its client and supplier relationships, as well as its relationships with is employees, officers, and contractors, important and valuable assets.  Accordingly, as a condition of your employment or continued employment, if your employment ends with the firm and you are an MD/SVP (605), ED (604), or VP (603) certain restrictions will apply.  **For a period of one year after your employment with JPMorgan Chase terminates, or as allowed by local law/regulation, you are not permitted to, directly or indirectly**, on your own behalf or that of any other party, without the prior written consent of the Director of Human Resources of JPMorgan Chase:
>
> *     *     *
>
> solicit, encourage, induce, or attempt to induce to leave the Company, or divert or attempt to divert from doing business with the Company, any then current customers, suppliers, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Company, or otherwise interfere with the relationship between the Company and such customers, suppliers, and other persons or entities.  This does not apply to publicly known institutional customers that you service after your employment with the Company terminates without the use of the Company's confidential or proprietary information.  (Emphasis added.)

37.     JPMorgan requires employees, including Defendant, to annually affirm electronically their agreement to comply with the Code of Conduct.

### JPMorgan's Relationship With Its Clients And Its Confidential Information

38.     As indicated above, JPMorgan gave Defendant the substantial majority of the clients he was servicing at the time of his resignation.  The substantial

majority of clients assigned to Defendant were pre-existing JPMorgan clients who were reassigned to Defendant, were long-term Chase Bank clients who were referred to Defendant, or were developed by JPMorgan at the time they were assigned to Defendant.   In fact, Defendant was given by JPMorgan a significant book of business from a retiring advisor in or about 2014.

39.   JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.   It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.   JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.   It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.   JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Advisor or other team members resign or leave JPMorgan.   But for Defendant's employment with JPMorgan, Defendant would not have had any contact with the substantial majority of the clients the firm assigned to him and whom he is now soliciting.

40.   As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly

available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor.

41.    During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with the substantial majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

42.    A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

43.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients. JPMorgan has invested substantial corporate resources to develop and maintain its client information. The substantial majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years. JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

44.     JPMorgan also has expended significant resources to service its clients. These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

45.     JPMorgan employs reasonable efforts to maintain the confidentiality of its client records.   Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.

46.     The trade secret and confidential information that Defendant, on information and belief, has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties.  Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release.  Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality.   JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information.  For example, access to the JPMorgan's computer network by its professionals is password-protected.  JPMorgan also limits its client information to certain employees and management who need access to such information.

47.     Employees such as Defendant must maintain client information as strictly confidential.  These instructions are confirmed in the various agreements and policy manual provisions referenced.

### Defendant's Misconduct

48.     As noted above and incorporated herein, Defendant abruptly resigned from JPMorgan on June 14, 2022, immediately joined Stifel, and began soliciting JPMorgan clients.

49.     As set forth above, at least ten JPMorgan clients have informed JPMorgan that Defendant has solicited their business, requesting meetings with the clients or otherwise attempted to get them to transfer their accounts to him at Stifel, as detailed above.  These solicitations include phone calls, text messages and an in-person unannounced appearance at a client's residence.

50.     Defendant's solicitation of JPMorgan clients is ongoing and continuing.

51.     Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 15 JPMorgan households, with assets totaling approximately $24 million, already have transferred their accounts to Defendant at Stifel.

52.     Defendant's misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients.  Unless Defendant's misconduct is immediately restrained and enjoined,

other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

53.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, and unfair competition.   Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.   This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

54.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.   Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

> (a)    Loss of JPMorgan clients and loss of client confidence;
>
> (b)    Injury to JPMorgan's reputation and goodwill in Michigan;
>
> (c)    Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including client lists;

(d)   Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e)   Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## **FIRST CAUSE OF ACTION**
### **(Breach of Contract)**

55.   JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 54 hereof.

56.   Defendant breached his contract and agreement with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information.  By soliciting JPMorgan's clients and using and disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

57.   JPMorgan has performed all of its duties under all such contracts.

58.   JPMorgan has been injured and will continue to be injured by Defendant's breaches of his agreements with JPMorgan in an amount which cannot readily be ascertained or compensated by money damages.

59.   As a direct and proximate result of Defendant's breach of his contracts, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

60.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 59 hereof.

61.    JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.  Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

62.    As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

63.    JPMorgan realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 62 hereof.

64.    As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

65.    Defendant's fiduciary duties required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information.  Defendant's fiduciary duties required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company.

66.    Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing upon his resignation from JPMorgan and joining JPMorgan's competitor, Stifel.

67.    As a direct and proximate result of Defendant's breach of his fiduciary duties, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

68.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 hereof.

69.     By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan. Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan. Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

70.     Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

71.     Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

72.     As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the

damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
### (Intentional Interference with Actual
### and Prospective Economic Advantages)

73.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 72 hereof.

74.    JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

75.    JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

76.    JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with his new employer.

77.    There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond

the act of interference itself, including breach of contract, unfair competition, and breach of his fiduciary duties.

78.     Defendant's conduct was willful and malicious.

79.     As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Negligent Interference with Actual and Prospective Economic Advantages)

80.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 79 hereof.

81.     JPMorgan entrusted Defendant with confidential information for use solely in performing his duties as an employee of JPMorgan.  As an employee of JPMorgan, Defendant occupied a position of great trust and confidence.  Defendant thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty.  Defendant also was obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its clients.

82.     Defendant, in breach of his duty of due care, has attempted to induce JPMorgan clients to leave JPMorgan.

83.     JPMorgan is informed and believes, and on that basis alleges, that Defendant was fully aware that his failure to use ordinary care would cause JPMorgan to lose clients.

84.     As a direct and proximate result of Defendant's negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SEVENTH CAUSE OF ACTION**
**(Conversion)**

85.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 84 hereof.

86.     At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

87.     JPMorgan is informed and believes that Defendant took JPMorgan's trade secret and other proprietary information, including, but not limited to, confidential client contact information, and converted such information for the use of Defendant and those acting in concert with him.

88.     The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

89.     As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

90.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 89 hereof.

91.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

92.     As a direct and proximate result of the Defendant's' unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including, but not limited to, the directors, officers, employees and/or agents of Stifel, from:

(i) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

(ii) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.      Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's customers, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.      Such other and further relief as the Court deems just and proper.


Dated: July 19, 2022                    Respectfully submitted,

                                        ABBOTT NICHOLSON, P.C.


                                        By: _____
                                            Timothy J. Kramer (P36223)
                                            Daniel G. Kielczewski (P42875)
                                            1900 W. Big Beaver Rd., Ste. 203
                                            Troy, Michigan 48084
                                            (313) 566-2500
                                            tjkramer@abbottnicholson.com
                                            dgkielczewski@abbottnicholson.com

PADUANO & WEINTRAUB LLP
Leonard Weintraub
1251 Avenue of the Americas, 9th Floor
New York, New York 10020
(212) 785-9100
lw@pwlawyers.com

*Attorneys for Plaintiff*
J.P. Morgan Securities LLC

4878-1049-4506, v. 1